# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

ACTEON, INC.,

               Plaintiff,

    v.

JOSEPH B. HARMS,

               Defendant.

1:20-cv-14851-NLH-AMD

**OPINION**
**FILED UNDER SEAL**[1]

---

**APPEARANCES**:

JORDAN ELLIOT PACE
CHARLES J. FALLETTA
SILLS CUMMIS EPSTEIN & GROSS, PC
THE LEGAL CENTER
ONE RIVERFRONT PLAZA
NEWARK, NJ 07102-540

    *On behalf of Plaintiff*

JAMES S. RICHTER
MIDLIGE RICHTER LLC
645 MARTINSVILLE ROAD
BASKING RIDGE, NJ 07920

AVIVA GRUMET-MORRIS
KARA E. COOPER
WINSTON & STRAWN LLP
35 W. WACKER DRIVE
CHICAGO, IL 60618

    *On behalf of Defendant*

---

[1] This Opinion will be temporarily filed under seal for 10 days in the unlikely event some portion of this Opinion warrants sealing from public view. During that time, the parties shall notify the Court of any information they request to remain under seal pursuant to Local Civil Rule 5.3(c)(3).

**HILLMAN**, District Judge

This matter concerns claims by an employer against its former employee for breach of their agreements and trade secret violations when the employee began working for a competitor in the dental imaging industry.  Presently before the Court is the motion of the employer for a preliminary injunction against its former employee to enforce the non-competition provision in their contract and to prevent the disclosure of confidential and trade secret information to its competitor.  For the reasons expressed below, the Court will grant the employer's motion.

**BACKGROUND**[2]

Plaintiff, Acteon, Inc., is the U.S. entity of a group of affiliated companies.  Acteon is a medical technology company based in France which specializes in high-tech dental and medical devices and software, including in the area of intraoral and extraoral imaging.  Intraoral and extraoral imaging is the field concerned with producing two-dimensional (2D) and three-dimensional (3D) images for scanning, visualization, analysis, and diagnosis from inside or outside the mouth, including images of the teeth, gums, palate, jaws, bone structures and any other soft or hard tissues, as well as any external materials like implants, crowns, bridges, veneers, dental composites, and the

---

[2] The background information comes from Acteon's verified complaint, unless otherwise referenced.

like.  Intraoral and extraoral imaging in dentistry is used for implantology, endodontic, periodontal, restorative, and orthodontic dentistry.  Acteon, Inc. is responsible for marketing, sales, service, and support of Acteon products, including imaging devices and software throughout the United States and Canada.

In November 2017, Defendant, Joseph B. Harms, was hired by Marie-Laure Pochon, who was Chief Executive Officer of Acteon at that time, to serve as Acteon's Chief Operating Officer.  Soon thereafter, Harms was sued by his former employer, Carestream Dental LLC, in Georgia state court for breach of non-competition and non-solicitation agreements as well as misappropriation of trade secrets.  The Georgia court issued a temporary restraining order ("TRO") and later a preliminary injunction against Harms.  The Georgia action settled in May 2019.[3]

Acteon had terminated Harms' employment when the Georgia TRO was issued, but Acteon rehired Harms in June 2019.  Upon his rehire, Acteon and Harms entered into an employment agreement which contains a non-competition provision.  The non-compete

---

[3] Acteon paid for the entirety of Harms' legal defense during the litigation with Carestream Dental.  It also paid money to settle the case in May 2019.  (Docket No. 15-2 at 5.)  One term of the separation agreement between Acteon and Harms was that Acteon waived its right to reimbursement to the funds it expended on Harms' behalf for the Carestream litigation. (Docket No. 3-9 at 2.)

provision provides, in part, that Harms would not work within the United States for a company that sells or markets a "competitive product," as defined by the agreement, for one year.

As Chief Operating Officer of Acteon, Inc., Harms was the head of business for Acteon in the United States, Canada, South Korea, and Australia/New Zealand, and he had overall responsibility in these geographic locations for sales, marketing, logistics, accounting, human resources, and customer support, among other responsibilities. According to Acteon, the employment agreement required Harms to participate in the management of Acteon, including commercial development and product research and development, which he did. Acteon claims that Harms participated in Acteon's executive management meetings, during which Acteon's trade secrets were discussed, including research and development, strategic plans, and more.

In January 2020, Acteon terminated Pochon's employment. In October 2020, Pochon became CEO and President of 3Disc, which is also in the dental imaging industry. 3Disc sells an intraoral scanner called the HeronIOS, which it bundles with software called the HeronClinic. Acteon claims that 3Disc's HeronIOS and HeronClinic are "competitive products" to Acteon's AIS imaging software and its ActeonIOS, which is currently in development.

On June 30, 2020, Acteon terminated Harms' employment as a

reduction in force due to the COVID-19 pandemic.  Acteon and Harms entered into a separation agreement, effective July 9, 2020.  The separation agreement provided that Acteon would pay Harms a certain amount so long as he did not violate its terms, which included, among other things, to keep secret and retain in strictest confidence Acteon's trade secrets, and to return Acteon's documents, property, and other confidential information.  Acteon claims that the separation agreement expressly preserves Harms' obligations to Acteon under the employment agreement with respect to confidentiality, non-competition, and other restrictive covenants.  Acteon has paid Defendant the gross amount of $92,291.69 since July 2020.[4]

On October 8, 2020, Harms informed Acteon that he began employment with 3Disc as its Executive Vice President of the Americas.[5]  As a result, Acteon claims that Harms has breached the non-compete provision in the employment agreement by joining 3Disc prior to the expiration of the one-year sit-out period. Acteon also claims that during his employment with Acteon and after, Harms has used, disclosed, and otherwise misappropriated Acteon's trade secrets related to the development of AIS and

---

[4] The separation agreement provides that Acteon would pay Harms a gross separation payment in the amount of $114,583.33.  (Docket No. 3-9 at 2.)

[5] See Docket No. 15 at 20.

other Acteon products and services, in violation of his
contractual confidentiality obligations and his obligations
under trade secret law.

Acteon explains that parallel with the development of its
own intraoral scanner, Acteon has been actively seeking a third-
party supplier whose intraoral scanner Acteon could distribute
in the United States and elsewhere in the world.  During this
process, Acteon has evaluated intraoral scanners from a number
of different companies, including 3Disc.  Acteon claims that
Harms was responsible for supervising the evaluation of 3Disc's
HeronIOS as part of this process, including testing and
comparison with similar devices from other companies.  Acteon
claims that Harms was involved in and had access to the
formation of Acteon's opinion of the capabilities and
limitations of HeronIOS as compared with other devices, which in
turn informs Acteon's bargaining position.  Acteon claims that
if Harms discloses these trade secrets to 3Disc, it
significantly weakens Acteon's bargaining position.

Acteon further claims that Harms was also involved in and
had access to other aspects of Acteon's strategic plans,
including pricing and projected sales of the intraoral scanners
it would distribute, and if Harms discloses these trade secrets
to 3Disc, it would allow 3Disc to undercut Acteon's pricing and
unfairly compete with Acteon's sales.

6

On October 22, 2020, Acteon filed its instant action against Harms, asserting four counts: Count One - breach of contract for Harms' alleged breach of the employment agreement and the separation agreement; Count Two - common law misappropriation of trade secrets; Count Three - violation of New Jersey Trade Secrets Act, N.J.S.A. 56:15-1, et seq.; and Count Four - violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831, et seq.

That same day, Acteon sought a temporary restraining order against Harms.  On October 23, 2020, the Court granted that relief, ordered expedited discovery, and set a hearing for November 2, 2020 for Harms to show cause as to why a preliminary injunction should not be issued for Acteon's claims against him.[6] (Docket No. 10.)  On November 2, 2020, the Court heard argument on Acteon's application.  The Court extended the TRO against Harms through November 6, 2020.[7]   The Court issues this Opinion

---

[6] The Court also ordered Acteon to post a $100,000 bond to comply with the bond requirement of Fed. R. Civ. P. 65(c).  Acteon filed its bond on October 30, 2020.  (Docket No. 18.)

[7] Federal Civil Procedure Rule 65(b)(2) provides that where there is no notice to the defendant, temporary restraints cannot exceed 14 days.  Here, notice was provided to Harms.  "The most prevalent view is that a temporary restraining order, even if issued with notice, cannot be continued beyond the periods prescribed in Fed. R. Civ. P. 65(b) without being treated as the equivalent of a preliminary injunction and thus subject to appellate review."  Nutrasweet Co. v. Vit-Mar Enterprises, Inc., 112 F.3d 689, 692 (3d Cir. 1997).  The November 6, 2020 TRO expiration date is 14 days from the day it was issued.  Cf.

and its findings for the reasons expressed on the record and as set forth below.

## DISCUSSION

### A.   Subject Matter Jurisdiction

This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

### B.   Standard for Preliminary Injunction

A preliminary injunction "is an extraordinary remedy . . . which should be granted only in limited circumstances." Holland v. Rosen, 895 F.3d 272, 285–86 (3d Cir. 2018) (internal citations omitted).  A preliminary injunction should not be issued "unless the movant, by a clear showing, carries the burden of persuasion." Id. (citation omitted).  That burden typically involves four factors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm to the applicant; (3) whether the denial of a preliminary injunction  would injure the moving party more than the issuance of an injunction would

_____

Corporate Synergies Group, LLC v. Andrews, 775 F. App'x 54, 57 n.2 (3d Cir. 2019) (citing Nutrasweet, 112 F.3d at 692) (finding that a TRO could exceed 14 days where there was notice to the defendant, and determining that a district court's decision to temporarily restrain a defendant while envisioning a preliminary injunction hearing, that would occur after expedited discovery was complete in about a month, fulfilled the requirement that temporary restraining orders are of short duration and terminate with a ruling on the preliminary injunction).

harm the non-moving party; and (4) whether the grant of relief would serve the public interest.  Id. (citation omitted).

"[A] movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief. Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017) (citations omitted).

"If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."  Id.  "How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief."  Id. (citation omitted).

C.  **Analysis**

The Court will first determine whether Acteon has satisfied the first element for a preliminary injunction - a reasonable likelihood of success on the merits - for its breach of contract claims and its trade secret violation claims and then turn to the issue of irreparable harm.  Following those determinations,

9

the Court will assess the other two factors and then all four factors for all of Acteon's claims in combination.

>   1.   **A reasonable likelihood of success on the merits**

>        a.   ***Breach of Contract***

To establish a breach of contract claim, Acteon must show (1) "that the parties entered into a valid contract"; (2) "that the defendant failed to perform [its] obligations under the contract"; and (3) "that the plaintiff sustained damages as a result." HR Staffing Consultants, LLC v. Butts, 2015 WL 3492609, at *7 (D.N.J. 2015) (quoting Murphy v. Implicito, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007)).

Specifically with regard to non-compete agreements in employment contracts, for more than a century, New Jersey has upheld restrictive covenants in employment agreements.[8] ADP, LLC v. Rafferty, 923 F.3d 113, 120 (3d Cir. 2019).  New Jersey accepts that "non-compete agreements are a common part of commercial employment," and "recognizes that noncompete agreements can serve a useful purpose so long as the agreement is not unreasonable."  To ensure that such agreements remain reasonable, New Jersey courts do not hesitate to "blue pencil" a covenant but will rarely invalidate one in full.  Id. at 122 (discussing Solari Industries, Inc. v. Malady, 55 N.J. 571, 264

---

[8] The parties agree that the contracts at issue provide that New Jersey law governs their agreements.  (Docket No. 3-11 at 15.)

A.2d 53 (1970), which held that while an employer that "extracts a deliberately unreasonable and oppressive noncompetitive covenant" should receive no benefit, courts should partially enforce an overbroad covenant as long as it is "[1] reasonably necessary to protect [an employer's] legitimate interests, [2] will cause no undue hardship on the defendant, and [3] will not impair the public interest").

An "employer has no legitimate interest in preventing competition as such or simply prohibiting an employee from exercising her general knowledge within the industry," but "employers have patently legitimate interests in their trade secrets, confidential business information, and customer relationships."  Id. (citations omitted).

"[E]mployers may have legitimate interests in protecting information that is not a trade secret or proprietary information, but highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which the employee has been exposed and enriched solely due to his employment."  Ingersoll-Rand Co. v. Ciavatta, 542 A.2d 879, 894, (N.J. 1988), cited in ADP, 923 F.3d at 122 n.8.  Although courts must construe narrowly this interest as part of the reasonableness analysis, it is a "business reality that modern day employers are in need of some protection against the use or

11

disclosure of valuable information regarding the employer's business, which information is passed on to certain employees confidentially by virtue of the positions those employees hold in the employer's enterprise." Ingersoll-Rand, 542 A.2d at 894.

Acteon claims that Harms has breached both his employment contract and his separation agreement. Acteon claims that the separation agreement expressly preserved Harms' obligations under the non-compete and the confidentiality provisions.

With regard to the non-compete provision, the parties' employment agreement provides:

> for a period of one (1) year following the date of termination of employment for any reason whatsoever, [Defendant] will not, within the United States, directly or indirectly, enter or engage in any business (whether as a partner, joint venturer, employee, agent, officer, director, shareholder, or otherwise) which designs, develops, manufactures, sells or markets any Competitive Product (as defined below) on or prior to Executive's date of termination of employment. "Competitive Product" means any product or component thereof, product line or service that has been designed or is being designed, developed, manufactured, marketed or sold by anyone other than [Acteon] and is: (i) of the same general type, (ii) performs similar functions, (iii) is used for the same purposes as a[n Acteon] product, and/or (iv) competes for the same customers and/or patient with any product, process or service that Acteon markets or is developing to market.

(Docket No. 1 at 6.)

The employment agreement and the separation agreement also require Harms to maintain the secrecy of Acteon's confidential, proprietary, and trade secret information and not use or

disclose such information.[9]

Acteon claims that Harms violated these provisions in the following ways, and presents the following evidence gathered in the limited discovery conducted to-date:

- Instead of complying with the required one-year waiting period, Harms began working at 3Disc three months after he signed the separation agreement, and 3Disc manufactures two "competitive products" – 3Disc's HeronClinic is a competitive product to Acteon's AIS; 3Disc's HeronIOS is a competitive product to Acteon's imaging products, as well as its active development of ActeonIOS.

- In Acteon's process of development of its own intraoral scanner or in seeking a third-party supplier, Harms was responsible for supervising the evaluation of 3Disc's HeronIOS, and Harms was involved in and had access to the formation of Acteon's opinion of the capabilities and limitations of HeronIOS as compared with other devices. Harms was also involved in and had access to other aspects of Acteon's strategic plans, including pricing and projected sales of the intraoral scanners it would distribute.  Such information is confidential, proprietary, and constitutes trade secrets, which if shared with 3Disc, would undercut Acteon's pricing and unfairly compete with Acteon's sales.

- On May 3, 2020, while Harms was still employed at Acteon, Pochon emailed Harms at his personal email address.  Pochon asked Harms to send her updated information to a January 2020 power point presentation that was prepared by Acteon's research and development partner, which performed a detailed analysis of the accuracy of 3Disc's HeronIOS software.  Pochon told Harms that she had been cautious and no one would know the request had come from her.  Pochon suggested that Harms represent that his update request was coming from someone else.  Pochon instructed Harms to be

---

[9] Because the parties' agreements concern the non-disclosure of trade secrets, the analysis of Acteon's breach of contract claims overlaps to a certain degree with Acteon's trade secret violation claims.  The Court will note any distinction between those causes of action within the four-factor preliminary injunction analysis.

careful, do not forward her email, and to rename the document.  Pochon concluded that "we" need it.  A few minutes later, Harms forwarded the January 2020 presentation, which was marked the intellectual property of the research and development partner, from his Acteon email address to his personal email address.

- On May 12, 2020, while Harms was still employed at Acteon, Harms sent an email from his Acteon account to his personal email account with an attachment of a spreadsheet of Acteon's confidential, trade secret sales figures.

- On May 25, 2020, while Harms was still employed at Acteon, Harms sent an email from his Acteon account to his personal email account with an attachment of a power point presentation containing slides from Acteon's board of directors meeting in October 2019.  The power point was created by Pochon using the Acteon slides to present to investors in her efforts to buy 3Disc for an October 2020 launch, which included Harms, as both his and her names appear on in the presentation, as well as their biographies and photographs.

- On June 4, 2020, while Harms was still employed at Acteon, Harms sent an email from his Acteon account to his personal email account with an attachment of a spreadsheet containing Acteon's confidential information related to pricing, discounts, margin, and other critical sales and financial information.

Harms presents several arguments to negate Acteon's

claims.[10]  Harms contends that 3Disc does not make a "competitive

---

[10] Harms also makes two arguments regarding the validity and enforceability of the parties' agreements in addition to Harms' arguments as to the substance of Acteon's breach of contract claims:

(1) Harms contends that it is doubtful that Harms received any consideration in exchange for executing the Separation Agreement.  Under the Employment Agreement, if Harms was involuntarily terminated without cause, he was entitled to (i) nine months' severance; and (ii) the release of any obligation to reimburse Acteon for the cost of defending him in the Carestream litigation.  The "consideration"

product." Harms argues that 3Disc makes one product - a 3D
intraoral scanner - which Acteon does not make, and Acteon's
development of a 3D intraoral scanner is years away from
completion. Harms therefore contends that he has not violated

---

provided to Harms in exchange for executing the subsequent
Separation Agreement was (i) only five months' severance;
(ii) the release of any obligation to reimburse Acteon for
the cost of defending him in the Carestream litigation; and
(iii) payment of a bonus that he had already earned.
(Docket No. 15 at 28 n.5.)

(2) Acteon argues that Harms breached the Separation
Agreement by violating the restrictive covenants contained
in the Employment Agreement because the restrictive
covenants "were expressly preserved by the Separation
Agreement." (Compl. ¶ 81.) But that is precisely the issue
– the Separation Agreement does not incorporate the
Employment Agreement's restrictive covenants, but rather
preserves these covenants. For this reason, Harms could
not have breached the Separation Agreement by violating the
Employment Agreement's restrictive covenants. (Docket No.
15 at 30-31 n.6.)

The second argument is largely a red herring in that the
enforceability of the employment agreement, which contains post-
employment restrictions independent of the separation agreement,
does not turn on the enforceability of the separation agreement
which undermines any attack on the separation agreement as
lacking consideration. Moreover, it seems likely that Acteon
will be able to prove that it had a valid basis to terminate
Harms for cause. As set forth in the affidavit of Michael
Rynerson, who became Chief Executive Officer of Acteon in June
2020, Harms' job performance had sharply declined in the months
prior to his termination and he had delegated much of his duties
to a subordinate. (Docket No. 20-1 at 1.) As emails now
revealed show, Acteon seems likely to prove that Harms had one
foot out the door and shifted his allegiance to his future
employer, 3Disc, prior to his termination from Acteon. Under
such circumstances, the separation agreement is either well-
supported by consideration or as at least as a matter of equity
Harms may be estopped from contesting its enforceability in
light of his unclean hands.

the non-compete provision, which he claims is unreasonable, and he cannot inevitably disclose any Acteon trade secret information, due to the lack of any competitive relationship between Acteon and 3Disc. Harms further contends that he was not involved with research and development of Acteon's intraoral scanner. Harms also claims that any documents he emailed to himself were to print while working from home, as the documents have no value to his position at 3Disc, they contain information that is not confidential or constitute a trade secret, and their contents were otherwise already known to Pochon from her tenure at Acteon.[11]

Continuing, Harms contends that even if Acteon can identify information that could constitute a trade secret, it has not shown that it has endeavored to keep such information confidential, which is evidenced by the fact that Acteon chose not to enforce a non-compete against Pochon, notwithstanding the fact that its R&D department was under her direct supervision when Acteon allegedly began developing its own intraoral scanner.

For its breach of contract count, the Court finds that Acteon has demonstrated a reasonable likelihood of success on

---

[11] Also raised by both parties is the relevancy and propriety of reference to Harms' litigation with Carestream. The Court does not need to consider the circumstances of that case to resolve Acteon's motion for a preliminary injunction.

the merits.  Harms and Acteon entered into valid contracts - the employment agreement and the separation agreement - that explicitly required Harms, as is relevant here, to (1) protect and not reveal Acteon trade secrets and other confidential business information, and (2) refrain from working for another employer who sells a "competitive product" for one year within the United States.  Harms received financial consideration for his obligations under the contract in exchange for these conditions, for which Acteon has a patently legitimate interest.

The evidence in the record demonstrates that Acteon may likely prove that Harms breached these obligations.  During his time at Acteon, Harms served as its Chief Operating Officer, and in that high-level executive position, Harms was an integral part of Acteon's management, commercial development, and product research and development.  Harms participated in Acteon's executive management meetings, during which Acteon's trade secrets were discussed, including research and development, strategic plans, and more.

While in a position entrusted with the most coveted information for the prosperity of the business and Acteon's current and future business development strategies, Harms emailed this information to himself at his private email address.  Although Harms claims that doing so was simply to print the information at home while working remotely due to the

pandemic, such a contention is belied by Harms' obvious contemporaneous plot to leave Acteon and join forces with Pochon to acquire and run 3Disc.  The May 3, 2020 email from Pochon to Harms to effectively steal updated, confidential research of the 3Disc HeronIOS software from Acteon, and the May 25, 2020 email with Pochon and Harms' presentation to 3Disc investors using Acteon's confidential business information are two glaring examples of Harms' plans and represent clear breaches of his employment contract and separation agreement.

Harms' attempt to downplay his role at Acteon into one of a simple salesman without any part in Acteon's research and development of its own intraoral scanner and other business plans is undermined by not only his title and the accompanying responsibilities and obligations as Chief Operating Officer, but also the documents he had access to and forwarded to himself and Pochon.  Harms' contention that this information is of no value because Pochon already knew the information during her time at Acteon is specious because Pochon, who left Acteon in January 2020, requested updated information from May 2020.  Moreover, if the information had no value, it would not have been incorporated into their own power point presentation in their quest to acquire 3Disc.  Defendant's argument also begs an obvious question.  If Pochon already had the information why did she have to ask for it?  Her request for it is convincing proof

18

she did not have it as Defendant contends, or at least not in the requisite timely detail she wanted.  Additionally, sales data and projections about products not sold by 3Disc remain confidential, valuable information to Acteon that shows Acteon's pricing models, and if revealed, could be used to undercut Acteon in the market as a whole.

Further, Harms' efforts to cast 3Disc as not having a "competitive product" - and therefore Harms' actions do not violate the non-compete provision - are similarly without merit. Even though 3Disc sells a 3D intraoral scanner and Acteon does not at this time,[12] the non-compete provision is broader than Defendant's myopic focus on whether the two companies currently sell identical products.  The agreement defines a "competitive product" as "(i) of the same general type, (ii) performs similar functions, (iii) is used for the same purposes as a[n Acteon] product, and/*or* (iv) competes for the same customers and/or patient with any product, process or service that Acteon markets *or is developing to market*."  (Docket No. 1 at 6, emphasis

---

[12] Harms, through a declaration of Pochon, argues that 3Disc is many years away from the launch of a 3D intraoral scanner, while Acteon disagrees with that assessment and contends that it is much sooner.  In light of the employment agreement's language covering products in development, the dispute over the timeline of Acteon's 3D intraoral scanner does not take Acteon's intraoral scanner in development, OEM alternatives and related software outside the definition of "competitive product" as defined in the non-compete provision.

added.)  The evidence in the record clearly shows that Acteon is actively developing an intraoral scanner that will compete directly with 3Disc's intraoral scanner, and 3Discs's HeronIOS and HeronClinic are of the same general type, perform similar functions, are used for the same purposes, and compete for the same customers as various devices and software in Acteon's product line.

Acteon's decision not to purchase 3Disc does not, as Harms argues, remove 3Disc as a competitor, or make the information gathered by Acteon about 3Disc not confidential and useful to Acteon.  Most importantly, Defendant knew all about Acteon's ambitions in the area of CAD and intraoral scanners and actively conspired with Pochon while he was still at Acteon to put Acteon at a competitive disadvantage through her acquisition of 3Disc. As the "4DD – Crowns" power point made clear, Pochon and Harms sought investors to make the HeronIOS product the dominant market leader in CAD and intraoral scanners before Acteon and other large companies still selling older technology could play catch-up.

Harms' conspiracy with Pochon is evidenced by their use of information in Acteon's power point presentation to Acteon's board in October 2019, which Harms emailed to his personal account on May 25, 2020.  In her efforts to acquire 3Disc, Pochon presented an Acteon slide, which referred to Acteon's

20

projected growth from 2014 to 2019 based on all of its imaging devices, including "3D, 2D, X-Ray, Scanners-Sensors, Cameras," but "excluding CAD." This evidences that Harms and Pochon knew that Acteon was planning to purchase an OEM intraoral scanner for use with new software so it too could compete in the emerging CAD market at least in the short term. The main focus of the investor power point is that the HeronIOS already on the market could capture the market before the larger market players like Acteon could compete with their own branded CAD scanners.

The point here is not to preclude fair and honest competition in the CAD scanner market or bar Harms from using his general knowledge and experience even in a specialized field. But Plaintiff had the right to contractual bar its own senior officers from aiding its competitors surreptitiously and unfairly. Among other obligations, Harms contracted with Acteon to not reveal confidential information and to not work for a competitor for one year. The record shows that it is likely that Acteon will prevail by showing that Harms has clearly and even blatantly breached, and is continuing to breach, these obligations.

### b.  *Violation of trade secret law*

As noted above, <u>supra</u> note 9, the analysis of Acteon's breach of contract claims overlaps to a significant degree with Acteon's trade secret violation claims. The Court will still

determine whether Acteon is entitled to a preliminary injunction on its trade secret claims independent of its breach of contract claims, as Acteon's trade secret claims present a different test.

Violation of the NJTSA, N.J.S.A. 56:15-1, et seq., and DTSA, 18 U.S.C. § 1831, et seq., require a plaintiff to show "(1) the existence of a trade secret, defined broadly as information with independent economic value that the owner has taken reasonable measures to keep secret, and (2) misappropriation of that secret, defined as the knowing improper acquisition and use or disclosure of the secret." Bramshill Investments, LLC v. Pullen, 2020 WL 4581827, at *3 (D.N.J. 2020) (quoting Par Pharm., Inc. v. QuVa Pharm, Inc., 764 F. App'x 273, 278 (3d Cir. 2019)). "[T]he analysis under [the] DTSA folds into that of [the] NJTSA." Id. (citations omitted).

Misappropriation is defined in the DTSA to include "[1] 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means' or [2] 'disclosure or use of a trade secret of another without express or implied consent' in specified circumstances." Id. (citation omitted). "Improper means" is defined under the DTSA as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Id. (quoting

18 U.S.C. § 1839(6)).  Taken together, the DTSA "contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use."  Id. (citations omitted).

Under the inevitable disclosure doctrine, "an employer need not establish that its former employee has actually used or disclosed trade secrets.  Rather, an employer may demonstrate that there is a sufficient likelihood of inevitable disclosure of its trade secrets to a competitor."  Corporate Synergies Group, LLC v. Andrews, 2019 WL 3780098, at *7 n.10 (D.N.J. 2019) (quoting Osteotech, Inc. v. Biologic, LLC, 2008 WL 686318, at *3 (D.N.J. 2008) (quoting Fluoramics, Inc. v. Trueba, 2005 WL 3455185, at *8 (N.J. Ch. Div. Dec. 16, 2005)) (internal quotations omitted).

In the analysis of Acteon's breach of contract claims, the Court set forth the record evidence, discovered so far, constituting the trade secrets at issue: confidential sales data and projections, power point presentations with detailed, confidential analysis of 3Disc and its intraoral scanner and software commissioned by Acteon, information important and valuable enough to be presented to Acteon's board of directors, and Harms' personal knowledge of Acteon's efforts to develop its own intraoral scanner and software, as well as his participation in various business development strategies and efforts.

As discussed above, on the current record the Court rejects

23

Harms' contention that he was not involved in any way with research and development such that he does not have any personal knowledge of Acteon's trade secrets.  As for the tangible documents which Harms emailed to himself and Pochon, Harms contends that Acteon took no efforts to protect such documents, as evidenced by Acteon's failure to enforce its non-compete and employment agreement with Pochon,[13] and the information contained in those documents was common knowledge, so they cannot be considered trade secrets.

This conclusory argument holds no substance.  Only one example, the proprietary presentation by Acteon's research and development partner, need suffice.  While it can be said that 3Disc must know of the strengths and weaknesses of its product, it should be clear that it did not have Acteon's assessment, which Acteon bought and paid for, without Harms having surreptitiously obtained it at Pochon's direction on May 3, 2020.  That confidential information, which was explicitly proprietary to Acteon's R&D partner and shared only with Acteon, shed light into Acteon's strategies to compete with 3Disc.  In this situation, it is not only what the R&D partner thought, but also how Acteon might react to what the R&D partner thought that

---

[13] As discussed during the hearing, many factors played into Acteon's decision not to enforce their agreements with Pochon, including her status as a citizen of France.

24

constitutes a trade secret.  That Acteon considered the R&D partner's assessment of 3Disc to be proprietary, confidential and a trade secret is clear based on the manner in which it is marked, which is not dispositive but clearly telling, but also the manner in which it was handled internally.  This information was valuable to both Acteon and 3Disc, as Harms' cloak and dagger effort to get it to Pochon proves.

Acteon has shown that the above-described information readily meets the definition of a "trade secret."  Further, Acteon has shown that Harms has these trade secrets, and it is likely that Harms will inevitably disclose these trade secrets. Acteon has demonstrated a likelihood of the success on the merits of its trade secret violation claims.

### 2.   Irreparable harm to Acteon

The second of the first two most critical factors for obtaining a preliminary injunction is whether it is more likely than not that Acteon will suffer irreparable harm in the absence of preliminary relief.  Reilly, 858 F.3d at 179.  "Irreparable harm" means harm "such that legal remedies are rendered inadequate."  Tilden Recreational Vehicles, Inc. v. Belair, 786 F. App'x 335, 342 (3d Cir. 2019) (citing Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997)); HR Staffing Consultants, LLC v. Butts, 2015 WL 3492609, at *15 (D.N.J. 2015), aff'd 627 F. App'x 168, 172 (3d Cir. 2015) (citing Instant Air Freight Co. v. C.F.

Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989) (citing
Sampson v. Murray, 415 U.S. 61, 90 (1964)) ("Harm is considered
'irreparable' if it is not redressable by money damages at a
later date, in the ordinary course of litigation."). The
irreparable harm inquiry concerns threat of future harm, not
past harm. Anderson, 125 F.3d at 163–64.

"Courts in the Third Circuit and this District have had no
difficulty in finding that the loss of business opportunities
and goodwill constitutes irreparable harm. Likewise, New Jersey
courts recognize that the diversion of a company's customers may
constitute irreparable harm. This is so because the extent of
the injury to the business as a result of this type of conduct
cannot be readily ascertained, and as such, does not lend itself
to a straightforward calculation of money damages." ADP, LLC,
v. Olson, 2020 WL 6305554, at *12 (D.N.J. Oct. 28, 2020)
(citations and alterations omitted).

Acteon has demonstrated that it will suffer irreparable
harm if Harms is not enjoined from continuing to breach his
employment agreement and separation agreement, and if Harms is
not stopped from disclosing Acteon's trade secrets, on the most
fundamental bases – it will undercut Acteon's pricing and
product strategy, put Acteon at a commercial disadvantage, and
3Disc will gain an unfair advantage in competing for customers,
all of which harm cannot be calculated.

26

Acteon has met the irreparable harm factor for obtaining a preliminary injunction.  Cf. Tilden, 786 F. App'x at 342 (finding irreparable harm where "Belair learned about BNRV's [his former employer's] products, pricing strategy and other things that can be used to compete with BNRV and cause harm to it that cannot be calculated," and "Belair might harm BNRV's customer goodwill by using his training, confidential information, and personal customer goodwill to attract sales and customer loyalty from BNRV to Chesaco"); HR Staffing, 2015 WL 3492609, at *15 (finding irreparable harm where "Butts has been exposed to confidential information regarding Upstream and HR Staffing's potential business ventures that would compete with CarePoint," "Butts's position at CarePoint enables him to inform CarePoint about Upstream and HR Staffing's plans, to CarePoint's benefit and to Upstream and HR Staffing's detriment," and "[t]his lawsuit will likely span more than one year, at which point the enforcement of Butts's non-compete will become moot"); National Reprographics, Inc. v. Strom, 621 F. Supp. 2d 204, 229 (D.N.J. 2009) (finding irreparable harm where "Strom enjoyed unfettered access to NRI's business strategies. Given FLMR's stature as a direct competitor and Strom's significant involvement and participation in NRI's strategic business decisions, as well as his knowledge of NRI's strategies for its New Jersey branches, use of this information in his capacity for

27

FLMR is potentially inevitable even in the absence of the underlying NRI documents. There is no question that using NRI's confidential information and proprietary information for the benefit of its competitors could potentially destroy NRI's business, built over 100 years"); National Starch and Chemical Corp. v. Parker Chemical Corp., 530 A.2d 31, 33 (N.J. Super. App. Div. 1987), cited in National Reprographics, 621 F. Supp. 2d at 229 (finding that the record adequately supported the reasonableness of a preliminary determination that the defendant employee knew trade secrets of the employer, and that under the circumstances there was sufficient likelihood of inevitable disclosure, with consequent immediate and irreparable harm to the employer, to warrant interlocutory relief preserving the status quo pending trial).

### 3. Whether the denial of a preliminary injunction would injure Acteon more than the issuance of an injunction would harm Harms

Having found that the first two gateway factors for a preliminary injunction have been met, the Court must next consider whether the denial of a preliminary injunction would injure Acteon more than the issuance of an injunction would harm Harms. Reilly, 858 F.3d At 179.

"[A] temporary injunction prohibiting someone from pursuing his livelihood in the manner he chooses operates as a severe restriction on him that a court should not impose lightly.

28

Nevertheless, such a temporary restriction on his employment is warranted where . . . the facts demonstrate that the restriction is necessary to prevent greater irreparable harm from befalling another party." Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 119 (3d Cir. 2010). Courts considering the hardship prong assess "'the likelihood of the employee finding work in his field elsewhere . . . [and] the reason for the termination of the relationship between the parties to the employment contract.'" HR Staffing Consultants LLC v. Butts, 627 F. App'x 168, 172 (3d Cir. 2015) (quoting Karlin v. Weinberg, 77 N.J. 408, 390 A.2d 1161, 1169 (1978)).

Harms argues that an injunction which prevents him from continuing to work at 3Disc would cause him undue financial hardship because of his personal obligations to support his family. Harms further argues that his need to seek employment elsewhere was a result of Acteon terminating him, rather than him leaving Acteon on his own volition. Harms also contends that 3Disc will face financial ruin, be forced to file for bankruptcy, and terminate all 26 American employees if he is precluded from working at 3Disc because he is one of only three employees who handles 3Disc's business in the North, Central, and South America.

The record shows that Harms has received $92,291.69 from Acteon in the four months since his employment with Acteon

29

ended.  To date, Harms has worked for 3Disc for approximately

four weeks.[14]  Harms' prophecy of doom for himself and 3Disc is

dubious, particularly because an injunction issued by this Court

would not preclude Harms from working for 3Disc outside of the

United States, and the injunction as to the non-compete would

only last the remainder of the one-year sit-out period, which is

eight months.  Moreover, 3Disc's contention that it will face a

financial crisis without Harms proves too much.  As for Harms

himself, the argument demonstrates a point both sides seem to

concede - that he is a very capable employee who would have

little problem finding employment elsewhere including within the

field of dental product sales, which Harms has done in the past

when faced with a similar situation with a previous employer.

But as to 3Disc it begs the question as to why the success

of the company rises or falls on Harms, and only Harms, assuming

its chief sales position for the next eight months.  Surely,

there are other accomplished and experienced salespersons in the

field of dental equipment other than Harms available to 3Disc

which would prevent its demise, such demise a speculative

contention the Court notes has little or no support in the

record.  Nor does it make common or practical sense.  It seems

highly unlikely that investors would not want Pochon's

---

[14] It is not clear from the record the amount of compensation
Harms is receiving from 3Disc.

acquisition of 3Disc, which has worldwide ambitions, to succeed despite Harms' unavailability to oversee U.S. operations for the next eight months.

Moreover, Harms' argument is that he will have difficulty finding employment, suggesting it is a buyer's market for accomplished salespersons.  It seems clear that 3Disc wants Harms not because of this talent as a salesman, a talent in abundant supply, but because of the information he was privy to at Acteon.  Finally, even though Acteon terminated Harms in June 2020 due to a reduction in force because of the pandemic, it is evident from Harms' emails that as of May 2020, Harms was already planning on joining 3Disc in October 2020.  In sum, the balance of harm in this case strongly favors Acteon, and not Harms.

### 4.   Whether the grant of relief would serve the public interest

The final factor the Court must consider in determining whether to issue a preliminary injunction is whether such an injunction would serve the public interest.  Reilly, 858 F.3d At 179.  The public has an interest in upholding reasonable, bargained-for provisions of contracts.  Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 119 (3d Cir. 2010) (citation omitted).  "The public has an interest in safeguarding an employer's confidential information," and "there is a

31

generalized public interest in upholding the inviolability of trade secrets and enforceability of confidentiality agreements." Id.; see also Tilden Recreational Vehicles, Inc. v. Belair, 786 F. App'x 335, 342–43 (3d Cir. 2019) (explaining that some public interest factors are to "discourage the wrongful use of confidential information, protect legitimate business interests and prevent unlawful competition," and affirming the district court's finding on the public interest factor that the protection of confidential information "outweighs the temporary restriction on [the former employee's] choice of employment").

Additionally, where, as here, if the plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, the public interest will almost always favor the plaintiff. National Reprographics, Inc. v. Strom, 621 F. Supp. 2d 204, 230 (D.N.J. 2009).

The public interest factor favors the issuance of a preliminary injunction against Harms and in Acteon's favor.

## CONCLUSION

Once a "competitor has obtained the secrets[,] [t]he cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss." HR Staffing Consultants LLC v. Butts, 627 F. App'x 168, 174 (3d Cir. 2015) (quoting Nat'l Starch & Chem. Corp. v. Parker Chem. Corp., 530 A.2d 31, 33 (N.J. Super. Ct. App. Div. 1987)).  A preliminary injunction

32

issued here will serve two goals - to enforce the parties'

agreement supported by ample consideration that Harms refrain

from working for a competitor for a limited period of one year,

in a geographically limited area smaller than both companies'

global reach and ambitions, and to prevent Harms from letting

Acteon's confidential information and trade secrets out of the

bag to one such competitor.  All four of the factors discussed

above, when taken together, balance in favor of granting the

requested preliminary relief.[15]

An appropriate Order will be entered.


Date: __November 6, 2020__          __s/ Noel L. Hillman__
At Camden, New Jersey               NOEL L. HILLMAN, U.S.D.J.


---

[15] The Third Circuit has observed in affirming a district court's issuance of a preliminary injunction in an employer's favor against a former employee in a similar context, see Bimbo, 613 F.3d at 119, the next step in this action is a disposition on the merits in the normal course, and if this Court ultimately holds that Acteon is entitled to relief, this Court will fashion a remedy appropriate to protect Acteon's trade secrets without unduly imposing on Harms' right to pursue his chosen occupation.